## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| EMC CORPORATION, ) | |
| ) | |
|         Plaintiff, ) | CIVIL ACTION NO. _____ |
| ) | |
| v. ) | |
| ) | |
| JEREMY LEBLANC, ) | |
| ) | |
|         Defendant. ) | |
| _____) | |

### VERIFIED COMPLAINT

Plaintiff EMC Corporation ("EMC") files this Verified Complaint for declaratory and preliminary and permanent injunctive relief and alleges as follows:

### NATURE OF THE ACTION

1. This is an action precipitated by the wrongful conduct of Jeremy LeBlanc ("LeBlanc"), who until recently was employed as a highly-compensated Senior Systems Engineer at EMC responsible for designing, developing and implementing customized technical solutions to allow customers to manage large volumes of information in complex technical environments. In this role, LeBlanc served both as the primary technical liaison between EMC and its key strategic customers during the pre-sales, product implementation and post-sales process and as the technical "wingman" to experienced sales representatives responsible for selling EMC's entire suite of products and services.

2. LeBlanc is now employed as a Systems Engineer at Pure Storage, Inc. ("Pure Storage") – a direct competitor of EMC in the enterprise storage market. In his new position at

Pure Storage, LeBlanc is responsible for performing the same functions he once performed at EMC with respect to Pure Storage's directly competing products.

3.      EMC learned recently that LeBlanc is violating his Key Employee Agreement ("KEA") with EMC by unlawfully soliciting EMC's customers – the very same customers he was responsible for selling to and servicing while employed by EMC – on behalf of Pure Storage.  EMC has also learned that LeBlanc is using EMC Confidential Information in order to advance his unlawful solicitation efforts.

4.      Pursuant to his KEA, LeBlanc has ongoing contractual obligations to EMC, including (a) not to use, divulge or disclose to persons outside of EMC its confidential and proprietary business information not available to the public concerning EMC and its customers ("Confidential Information"), (b) to return all Company materials as described in the KEA, (collectively with Confidential Information, "EMC Property") in his possession, custody or control upon leaving EMC, (c) not to, directly or indirectly, solicit business from any EMC customer to which LeBlanc attempted to or did sell EMC products or about which he obtained Confidential Information during his final two years at EMC, and (d) not to provide consulting services to any customer of EMC for whom he provided services during his final two years at EMC.

5.      This action seeks to require LeBlanc to honor his contractual obligations to EMC for the full contractual term of his KEA – ending May 17, 2015 – and to refrain from unlawfully using EMC's Confidential Information and soliciting EMC customers on behalf of LeBlanc's new employer, Pure Storage.  The relief sought by EMC is necessary in order to protect EMC's legitimate business interests, including its Confidential Information and goodwill in the marketplace, and to prevent EMC from suffering additional, irreparable harm.

6.      In limited instances where so indicated, allegations in this Verified Complaint are based upon information and belief.  Such allegations stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## PARTIES

7.      Plaintiff EMC is a Massachusetts corporation with its principal place of business in Hopkinton, Massachusetts, and other offices located in Boston, Massachusetts.

8.      Upon information and belief, Defendant LeBlanc is a resident of North Carolina. LeBlanc is bound by his KEA, which is expressly governed by Massachusetts law, and in which he expressly consented to personal jurisdiction in Massachusetts.  Ex. A, ¶ 7(h).

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between EMC and LeBlanc, and the amount presently in controversy exceeds $75,000, exclusive of interests and costs.

10.     This Court has personal jurisdiction over LeBlanc because, among other reasons, (a) LeBlanc transacted business and contracted with his former employer, EMC, in Massachusetts on matters directly related to the current dispute; (b) LeBlanc's actions complained of herein are causing injury to EMC in Massachusetts; and/or (c) LeBlanc expressly consented to personal jurisdiction in Massachusetts state and federal courts in his KEA. Ex. A, ¶ 7(h).

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events giving rise to the claims occurred in Massachusetts and LeBlanc is subject to this Court's personal jurisdiction with respect to this civil action.

# FACTUAL BACKGROUND

## *EMC is in a Highly Competitive Industry*

12.     EMC is one of the leading technology companies in the United States.  EMC is engaged in, among other things, the business of designing, manufacturing and selling technologies and information storage systems for managing information in complex technical environments.

13.     EMC competes with many companies in the markets that it serves, and its products have achieved broad market acceptance due in large part to their technical superiority to competing offerings and the team of skilled sales professionals, system engineers and technical consultants at EMC who effectively design, market and sell these products to EMC's customers. In order to maintain this competitive advantage, EMC expends substantial resources to safeguard and protect its Confidential Information and to develop and solidify its relationships with customers and potential customers.

14.     One of the significant markets in which EMC competes is the enterprise storage market.  Enterprise storage refers to the market for computer data storage designed for large-scale high-technology environments.  EMC and Pure Storage – LeBlanc's current employer – are direct competitors in the enterprise storage market.   Pure Storage's website has numerous references identifying EMC as Pure Storage's "primary competitor" in the enterprise storage marketplace, including numerous statements from Pure Storage's CEO describing EMC as a direct competitor.

15.     The enterprise storage market is highly competitive, particularly with respect to customization and pricing, both of which significantly impact the development, growth and sustainability of customer relationships.   The unique sales process for enterprise storage solutions requires that the solution and its pricing and terms be implemented and negotiated on a

customer-by-customer basis.  As a consequence of their training and employment with EMC, Systems Engineers such as LeBlanc develop deep solutions expertise and strong relationships with customers, on behalf of EMC, and must design creative custom solutions and pricing strategies tailored for each individual customer.

16.     The EMC solutions for which LeBlanc was responsible are not "off-the-shelf" products; rather, they are complex solutions that typically must be customized for highly sophisticated customers to the customer's information technology infrastructure and operating environment.  As the primary technical liaison to EMC's customers during the pre-sales, product implementation and post-sales process, Systems Engineers must work directly with the customer on an intimate basis in order to understand the customer's systems, develop an appropriate solution, and ensure that the customer remains satisfied with the solution and the ongoing consultation, maintenance and/or support services. In sum, EMC Systems Engineers such as LeBlanc play a vital role.

17.     EMC devotes substantial resources to establishing and maintaining goodwill with its enterprise storage customers.  EMC has made significant investments in developing client relationships and goodwill among its customers by continually designing market-leading products and services and by supporting the activities of EMC's sales force and Systems Engineers through expenditures on sales training, trade shows and education.  Through such efforts, EMC has established a reputation as the world leader in the enterprise storage market and has cultivated and maintained critically valuable relationships with its customers, including those customers with whom LeBlanc worked.

### *LeBlanc's Key Employee Agreement with EMC*

18.     LeBlanc was first employed by EMC from 1999 through 2005.  During this time period, LeBlanc worked at several of EMC's offices in Massachusetts in a variety of

engineering, solutions architect and technical consulting roles. LeBlanc later rejoined EMC as a Senior Systems Engineer working out of EMC's office in Raleigh, North Carolina from July 30, 2012 until May 17, 2014. During this time period, EMC paid LeBlanc more than $370,000 in total compensation.

19.     During his second tenure with EMC, LeBlanc's work as a Systems Engineer focused on developing, selling and implementing technical solutions and performing technical consulting services for key EMC strategic customers located primarily in North Carolina, South Carolina and southern Virginia. As a Senior Systems Engineer, LeBlanc acquired and was entrusted with competitively sensitive, confidential business information developed and used by EMC, including complex, highly technical information about EMC's product capabilities, product development plans, product offerings, technical specifications, pricing structures, solicitation methods, sales strategies, business plans, customer and partner lists, marketing strategies, and other confidential and proprietary information that would be extraordinarily valuable to an EMC competitor such as Pure Storage.

20.     LeBlanc was heavily involved in designing customized product solutions and preparing price quotes for EMC's customers. Consequently, he is uniquely familiar both with the "pricing floors" applicable to EMC's products and services, and with the technical advantages and performance of EMC's products relative to those of competing offerings.

21.     LeBlanc was also introduced to, and acquired knowledge of, ongoing and potential customer relationships and the key decision makers within EMC's customers, such as Chief Information Officers, Directors of Infrastructure, Purchasing Managers and IT personnel. In addition, he was uniquely familiar with the details of the sales opportunities for customers in

his region, including the products offered by EMC to customers, the size and details of the opportunities and the strategy of the sales campaign and product positioning.

22.    EMC devotes significant resources towards developing and maintaining the secrecy of the above-described information because it is a primary reason for EMC's success and its goodwill in the marketplace, including the goodwill it has earned from its customer relationships.

23.    To protect EMC's body of patentable, trade secret, and Confidential Information, and to protect its accrued goodwill and valuable customer relationships, EMC requires employees such as LeBlanc to enter into KEAs at the commencement of their employment with EMC.  A true and accurate copy of LeBlanc's KEA with EMC is attached hereto as Exhibit A.

24.    The KEA was entered into as (a) a condition of, and in consideration for, LeBlanc's employment with EMC, and (b) "[i]n view of the highly competitive nature of the business of [EMC], the need of [EMC] to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information, and in consideration for being provided with access to certain trade secrets and/or confidential and proprietary information in conjunction with [LeBlanc's] employment with [EMC]."  Ex. A.

25.    By executing his KEA with EMC, LeBlanc agreed, among other things, to the following one-year restrictive covenants:

> **(b)  <u>Non-Solicitation of Customers</u>**.  During your employment with [EMC] and for a period of twelve (12) months following the effective date of the termination of your employment with [EMC] for any reason, you will not (either on your own behalf or on behalf of any person or entity other than [EMC]) directly or indirectly solicit, or attempt to solicit, the business of any person or entity that is either a customer or a potential customer of [EMC], to which you, directly or indirectly, attempted to or did, sell or provide any product or service on behalf of EMC, or about which

you obtained any Confidential Information, during the two (2) year period prior to your last day of active employment with [EMC].

* * *

(c) **Restriction on Servicing Company Customers**. For a period of twelve (12) months following the effective date of the termination of your employment with [EMC] for any reason, you will not provide consulting or other IT services (as an employee, contractor, or in any other capacity) of the same or similar type you provided or performed as an employee of [EMC] to any customer of [EMC] for whom you provided services or managed the delivery of services on behalf of [EMC] during the two (2) year period prior to your last day of active employment with [EMC].

Ex. A, ¶¶ 1(b) and (c).

26.     LeBlanc's KEA also requires him, among other things, not to use, divulge or disclose to persons outside of EMC any Confidential Information, and to keep all non-public EMC materials and information confidential:

**Confidentiality of Company Materials**. You agree that both during your employment with [EMC] and thereafter you will not use for your own benefit, or for the benefit of any other person or entity, divulge or disclose to anyone, except to persons within [EMC] whose positions require them to know it, any information not already lawfully available to the public concerning [EMC] or any information constituting a trade secret ("Confidential Information"). Confidential Information includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business or products of [EMC]; any information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposals and the responses thereto.

Ex. A, ¶ 3.

8

27.     By executing his KEA with EMC, LeBlanc also expressly acknowledged that information about EMC's customers, partners and vendors was confidential, and he agreed never to use it or disclose it except as necessary to perform his job at EMC:

> **Customer, Partner, and Vendor Confidentiality**.  You recognize that it is essential to [EMC's] success that all non-public customer, partner and vendor information is deemed to be confidential and is properly treated as a confidential trade secret.  Therefore, you agree not to use or disclose any such customer, partner or vendor information except as may be necessary in the normal conduct of [EMC's] business for the specific customer, partner or vendor, and at the end of your employment with [EMC], you will return to [EMC] any materials containing such information.

Ex. A, ¶ 2.

28.     By signing his KEA, LeBlanc agreed that (i) "the terms of [the KEA] are reasonable and properly required for the adequate protection of [EMC's] legitimate business interests," and (ii) "any breach of [the KEA] will cause immediate and irreparable harm to [EMC] not compensable by monetary damages and that [EMC] will be entitled to obtain injunctive relief . . . to enforce the terms of [the KEA], without having to prove or show any actual damage to [EMC].  Ex. A, ¶¶ 7(c) and (d).

29.     EMC provided the KEA to LeBlanc for his review and execution, along with a cover letter from EMC's President and Chief Executive Officer, Joseph M. Tucci, stating, among other things:

> In consideration of your employment by EMC and in recognition of the fact that as an employee of EMC you have access to confidential information, I ask that you please review and sign the following Key Employee Agreement (the "Agreement").  This Agreement protects the Company's legitimate business interests including protecting both the Company and its employees from unfair competition from former employees.  This Agreement, when either signed or electronically signed by you, is a binding legal

agreement.  You are advised to review its terms with your legal advisor before signing it.

*** 

If you have any questions, either your supervisor or your human resources representative would be happy to discuss them with you. Please keep one copy of the Agreement for your records.

Ex. A (cover letter).

30.     LeBlanc reviewed his KEA electronically and provided an electronic signature acknowledging, among other things:

- "I acknowledge and agree that I was given adequate time to review the attached documents and ask questions."

- "I understand that I was given the opportunity to review the terms of the GSKEA with a legal advisor before signing (affirming)."

- "I have read, understand and agree I am legally bound by EMC's GSKEA (including but not limited to the Arbitration provision)."

Ex. A (affirmation).

31.     As a result of the cover letter from Mr. Tucci and the electronic acknowledgment form reviewed and returned by LeBlanc, LeBlanc was advised of (a) the legal significance of signing the KEA, (b) the opportunity to consult with a lawyer regarding the terms of the KEA, and (c) the opportunity to consult an EMC supervisor or human resources representative about the terms of the KEA.

32.     The KEA put LeBlanc on notice that (a) EMC could commence a court action against him in Massachusetts seeking injunctive and declaratory relief for violations of the KEA, (b) the appropriate venue for such action is "in the state and/or federal courts located in Massachusetts," and (c) the KEA "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law." Ex. A, ¶¶ 7(d), (h), and (j), ¶ 8.

33.     LeBlanc expressly agreed to "consent to personal jurisdiction in [the state and/or federal courts located in Massachusetts]."  *Id.*, ¶ 7(h).

34.     The cover letter from Mr. Tucci, as well as LeBlanc's written offer of employment, bears the address of EMC's headquarters located in Hopkinton, Massachusetts.  Ex. A; Ex. B (July 9, 2012 Offer Letter).

35.     As described above, LeBlanc worked at EMC's offices in Massachusetts from February 1999 through December 2005.   LeBlanc also visited Massachusetts for business purposes on multiple occasions during his second tenure of employment with EMC.   For example, LeBlanc traveled to Massachusetts for executive briefing sessions between senior EMC executives and customers on not fewer than five separate occasions in 2012 through 2014. LeBlanc also communicated on a regular basis with Massachusetts-based EMC employees via email and telephone in order to conduct the EMC-related business activities that he was hired, and paid by EMC, to perform.

***LeBlanc's Unlawful Solicitation of EMC Customers
on Behalf of Pure Storage in Violation of his KEA***

36.     LeBlanc's last day working at EMC's office in Raleigh, North Carolina was May 16, 2014.[1]   Upon resigning from EMC, LeBlanc requested a copy of his KEA from EMC. Immediately thereafter, he joined Pure Storage, working in the same general region in which he worked for EMC.   LeBlanc is now responsible for selling Pure Storage's directly competing product and servicing the same class of customers to which he sold EMC products and serviced while employed by EMC.   On information and belief, LeBlanc is one of only two Pure Storage employees assigned to the region once covered by LeBlanc for EMC.   EMC is currently

---

[1] Leblanc was paid by EMC until his effective date of termination: May 17, 2014.

competing directly against Pure Storage in several EMC customer accounts to which LeBlanc was previously assigned while at EMC.

37.     EMC recently learned that LeBlanc, in direct violation of his contractual obligations, is actively soliciting EMC customers to which he sold or attempted to sell products or about which he gained Confidential Information during his most recent tenure as a Senior Systems Engineer at EMC.

38.     EMC has confirmed that LeBlanc is directly soliciting CUSTOMER A[2] on behalf of Pure Storage in violation of his KEA.   During the two year period prior to his last day at EMC, LeBlanc was formally assigned to cover the CUSTOMER A account – one of EMC's largest and most active accounts in the region.   During this time period, LeBlanc coordinated with another EMC employee and successfully designed and sold more than $1 million of EMC product solutions and services to CUSTOMER A.   As the only Systems Engineer assigned by EMC to CUSTOMER A, LeBlanc was responsible for performing all of the technical due diligence and analysis regarding CUSTOMER A's particular information technology infrastructure and the customized architecture that was ultimately designed for, and sold to, CUSTOMER A by EMC.

39.     Prior to joining EMC in 2012, LeBlanc had no relationship with CUSTOMER A. Instead, he was introduced to various CUSTOMER A employees, including the key decision makers at CUSTOMER A, by the EMC sales representative assigned to the account solely as a consequence of his employment at EMC.   While at EMC, LeBlanc routinely and regularly interacted with various different CUSTOMER A professionals.

---

[2] The EMC customers identified herein ("CUSTOMERS A-D") are identified by name in the Declaration of Emil Velasquez, which is the subject of EMC's Motion to Impound Confidential Information, filed herewith.

40.     Through considerable effort, expense and expertise, EMC has developed a broad and critically valuable commercial relationship with CUSTOMER A.   LeBlanc's ongoing activities in disregard of his KEA with EMC is undermining the goodwill that EMC has developed and earned with this strategically important customer.   EMC's relationship with CUSTOMER A is active and ongoing.   For example, EMC made additional sales of EMC products and services as recently as last week, and there are substantial additional opportunities in the pipeline in the very near future.   As is typically the case with EMC's broad, market-leading solutions, customer enthusiasm over EMC's initial product installations frequently lead to deep relationships, and future sales to the customer of related and ancillary EMC products and services.

41.     LeBlanc is now soliciting business from CUSTOMER A on behalf of Pure Storage.   On or about June 6, 2014, LeBlanc conducted a meeting at CUSTOMER A with the CUSTOMER A technical team and another Pure Storage sales representative named Brian Chappell.   The purpose of the meeting was to persuade CUSTOMER A to purchase Pure Storage's directly competing product instead of EMC products recently pitched and sold by LeBlanc to CUSTOMER A.   EMC has learned that LeBlanc is using and disclosing Confidential Information he learned at EMC in an improper effort to induce the sales of Pure Storage product. Specifically, LeBlanc utilized his intimate and confidential knowledge of EMC products and their technical capabilities and disclosed certain Confidential Information to CUSTOMER A relating to EMC's VPLEX product in order to point out alleged deficiencies with VPLEX. LeBlanc actively attempted to sell VPLEX to CUSTOMER A while he was still employed by EMC.  CUSTOMER A purchased VPLEX from EMC only last week.

42.     LeBlanc has conceded to EMC employees that he solicited CUSTOMER A on behalf of Pure Storage.

43.     LeBlanc is also actively soliciting CUSTOMER B. EMC learned recently that LeBlanc and Pure Storage sales representative Brian Chappell orchestrated at least one on-site meeting at CUSTOMER B.  At the meeting, LeBlanc pitched Pure Storage's competing product. On June 2, 2014, CUSTOMER B spoke to an EMC employee and said words to the effect: "It's kind of funny that Jeremy LeBlanc was out here last week pitching Pure [Storage], when he was working for EMC only the week before.  I kind of wonder how he became a Pure [Storage] expert so quickly."

44.     In the last year alone, EMC has made seven-figure sales to CUSTOMER B.  In addition, EMC is in the process of selling additional EMC products to CUSTOMER B.

45.     In the two year period leading up to his final day at EMC, LeBlanc assisted other EMC Systems Engineers and sales representatives with servicing CUSTOMER B, particularly when LeBlanc's VMAX expertise was required.   During this period, LeBlanc obtained Confidential Information about CUSTOMER B, including information about the EMC products designed for CUSTOMER B and EMC's sales strategy.  Indeed, LeBlanc participated in weekly sales calls/meetings during which the CUSTOMER B account and EMC's sales strategies were discussed, including product positioning relating to EMC's XtremIO product.

46.     On or about June 5, 2014, LeBlanc approached his former supervisor at EMC while at a trade show.  LeBlanc told his former supervisor that he wanted to "set the record straight" about the EMC customers LeBlanc was actively pursuing on behalf of Pure Storage. LeBlanc admitted that he was soliciting CUSTOMER B.  LeBlanc stated that he should be allowed to solicit CUSTOMER B because he was not formally assigned to cover this account

while at EMC.  LeBlanc misconstrues his KEA obligations.  As explained above, although LeBlanc was not formally assigned to CUSTOMER B while at EMC, he obtained Confidential Information about CUSTOMER B as a direct result of his role at EMC and his involvement with CUSTOMER B while at EMC, including as a result of regular sales meetings and quarterly business reviews.

47.     The day after LeBlanc approached his supervisor at the trade show, LeBlanc attended the June 6, 2014 meeting at CUSTOMER A (a customer that was formally assigned to LeBlanc at EMC) that is described above.

48.     LeBlanc is also soliciting CUSTOMER C on behalf of Pure Storage.  A representative of CUSTOMER C recently told EMC that he knew LeBlanc was now employed by Pure Storage and that Leblanc had "reached out" to CUSTOMER C.  This conduct is a violation of LeBlanc's KEA with EMC.

49.     CUSTOMER C has been a large customer of EMC for approximately ten years.  During his tenure at EMC, LeBlanc was one of only two Systems Engineers in his geographical region.  The two often called on each other's accounts, and – when necessary – provided direct support to each other's assigned accounts.  Although LeBlanc was not officially assigned to EMC's CUSTOMER C account, he conducted extensive work and gained intimate confidential knowledge of the CUSTOMER C environment, EMC's customized solutions and services designed and installed at CUSTOMER C and pricing information.  He also developed valuable relationships with various CUSTOMER C employees as a result of his employment at EMC.

50.     During the two year period prior to his last day at EMC, LeBlanc worked extensively with other EMC sales representatives and Systems Engineers to service CUSTOMER C and to successfully promote and sell EMC products and services to

CUSTOMER C.  During this time period, LeBlanc participated in numerous meetings with CUSTOMER C and he obtained Confidential Information about CUSTOMER C.

51.     Prior to joining EMC in 2012, LeBlanc had no relationship with CUSTOMER C. Instead, the sales representative assigned to CUSTOMER C introduced LeBlanc to various key decision makers at CUSTOMER C and promoted and encouraged him to strengthen EMC's ongoing relationship with CUSTOMER C.  For example, LeBlanc was provided the opportunity to host representatives of CUSTOMER C at EMC's annual executive briefing sessions in Massachusetts.

52.     There are opportunities currently in the pipeline at CUSTOMER C relating to EMC products and services worth seven figures.

53.     LeBlanc is also actively soliciting CUSTOMER D on behalf of Pure Storage in violation of his obligations to EMC.  During the two year period prior to his last day at EMC, LeBlanc was directly assigned to cover the CUSTOMER D account.  During this time period, LeBlanc and an EMC sales representative generated several million dollars of sales of EMC products and services to CUSTOMER D.   Similar to the CUSTOMER C situation, a CUSTOMER D employee recently disclosed to EMC that he is aware LeBlanc is working at Pure Storage because LeBlanc has contacted CUSTOMER D.

54.     During the two year period prior to LeBlanc's last day at EMC, LeBlanc obtained sensitive Confidential Information about each of the EMC customers identified above as a consequence of his responsibilities at EMC, including knowledge of EMC's product technologies, capabilities and the architecture that EMC had designed and installed at, or was proposing to sell to, these customers and EMC's unique business processes, methods, and pricing methodologies and strategies.  Upon information and belief, LeBlanc used this information and

his specialized knowledge of the particular characteristics and performance of EMC's products to solicit these companies and to compete unfairly against EMC in an effort to win business on behalf of Pure Storage at the expense of EMC.

55.     LeBlanc's attempts to persuade EMC customers to instead purchase Pure Storage product necessarily involves, and has involved, LeBlanc comparatively deprecating EMC and praising Pure Storage, and trading on his presumed intimate knowledge of EMC technology to distinguish Pure Storage's competing product as higher quality, better priced, or both.

56.     EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its trade secrets and Confidential Information, including, but not limited to, requiring its employees to sign KEAs, requiring its customers, partners and vendors to sign non-disclosure agreements, password protecting its computer systems and employing physical security measures at all of its facilities. Moreover, EMC adopts and enforces several written policies that are designed to protect its Confidential Information and trade secrets, including following the concept of "least privilege," pursuant to which employees are only provided the minimum access needed to perform their assigned duties.

57.     But for his employment with EMC, LeBlanc would not have acquired, or gained access to, EMC Confidential Information.  A competitor of EMC – such as Pure Storage – could use such information to great advantage, by efficiently targeting companies and using EMC's own Confidential Information to compete against EMC to win business in a manner that would otherwise require months or years of investment and effort.

### LeBlanc's Unlawful Conduct Is Part of a Larger Scheme

58.     LeBlanc's unlawful solicitation of EMC customers is part of a larger commercial struggle by Pure Storage and numerous former EMC professionals it now employs to establish

Pure Storage's relevance in the enterprise storage market.  EMC is a pioneer in that market.
Apparently frustrated by the market's preference for EMC's superior technologies and expertise,
Pure Storage has launched a broad campaign to compete unfairly with EMC by, among other
things, unlawfully soliciting EMC's customers and raiding EMC of its valuable employees in an
effort to increase Pure Storage's presence in the marketplace at the expense of EMC.  Since last
year, nearly 70 high performing employees have departed EMC under suspicious circumstances
to join Pure Storage.  Based on information and belief, former EMC employees now make up
nearly 20% of Pure Storage's entire work force (of approximately 400 employees).

59.    EMC has taken extensive measures to stop Pure Storage's and its former
employees' systematic pattern of illegal conduct.  It wrote notices to the former employees and
to Pure Storage reminding them of the ongoing KEA obligations owed to EMC.  It sent cease
and desist letters to the former employees and to Pure Storage.  EMC also initiated lawsuits
against no fewer than six former EMC employees.  *See EMC Corporation v. Cruey et al.*,
Suffolk Superior Court, Civil Action No. 13-0843-C; *EMC Corporation v. Tanner*, Suffolk
Superior Court, Civil Action No. 13-2043-A; *EMC Corporation v. Cochran*, U.S. District Court
for the District of Massachusetts, Case No. 1:13-cv-12380-PBS; *EMC Corporation v. Johnson*,
U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12639-RWZ.  EMC has
obtained injunctive relief and court orders requiring its former employees to, among other things,
return EMC Property to EMC, and not to solicit certain former EMC customers.

60.    On November 4, 2013, EMC filed a Complaint in this district against Pure
Storage to finally put a stop to the unlawful conduct being orchestrated by Pure Storage and for
full redress of all harm it has caused EMC.  Yet, the unlawful campaign against EMC continues,
including through LeBlanc's solicitation of EMC customers in blatant disregard of his

obligations under the KEA.  This is among the precise conduct that the KEA is intended to

prevent.  It seeks to protect EMC's legitimate business interests, including its Confidential

Information, customer relationships and the goodwill it has earned in the enterprise storage

marketplace.

## FIRST CAUSE OF ACTION

### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 for Breach of the KEA)

61.     The allegations of the preceding paragraphs are incorporated by reference as if set

forth fully herein.

62.     As described above, and further set forth below, LeBlanc breached his KEA.

63.     As a result of LeBlanc's breaches and unlawful conduct, EMC has suffered and

will continue to suffer irreparable harm.

64.     An actual, substantial, justiciable, and continuing controversy exists between

EMC and LeBlanc concerning his breaches and unlawful conduct.

65.     Accordingly, EMC seeks a judgment pursuant to 28 U.S.C. § 2201 that LeBlanc

has breached one or more provisions of his KEA.

66.     The KEA is a valid and binding written agreement between EMC and LeBlanc.

67.     LeBlanc's KEA was made for valid consideration.

68.     EMC performed its contractual duties under LeBlanc's KEA.

69.     LeBlanc's KEA is reasonable, consonant with public policy, and is necessary to

protect legitimate business interests, including EMC's Confidential Information and Property

and goodwill in the enterprise storage market.

70.     As a result of the conduct described above, LeBlanc breached his KEA by (a)

directly or indirectly, soliciting and/or attempting to solicit the business of EMC's customers

and/or potential customers to which LeBlanc attempted to or did sell EMC products or about

which he obtained Confidential Information during his final two years at EMC, and (b) using Confidential Information to advance his wrongful solicitation of EMC customers.

71.     EMC has suffered and will continue to suffer irreparable harm as a result of LeBlanc's conduct.

## SECOND CAUSE OF ACTION

### (Injunctive Relief)

72.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

73.     EMC has a reasonable likelihood of succeeding on the merits of its claim for declaratory relief based on standard principles of contract interpretation, and the facts already developed and sworn to in this Verified Complaint.

74.     If LeBlanc continues to unlawfully solicit EMC customers and prospective customers, or use EMC Confidential Information, EMC will suffer irreparable injury. By contrast, if LeBlanc is enjoined from violating his KEA while this Court determines the rights of the parties, LeBlanc will suffer no such injury.

75.     This Court should enjoin LeBlanc from violating his KEA, including, but not limited to, the non-solicitation provision of his KEA during the pendency of this action.

### Prayers For Relief

WHEREFORE, Plaintiff EMC Corporation respectfully requests that this Court:

(i)     Grant EMC's Motion for Expedited Hearing on EMC's Motion for Preliminary Injunction, under prayer (ii) below;

(ii)    After a hearing, preliminarily enjoin LeBlanc from (a) directly or indirectly, soliciting and/or attempting to solicit, the business of the EMC customers described in the Verified Complaint and specifically identified by name in the Declaration of Emil Velasquez, which will be filed UNDER SEAL by EMC; and (b) further violations of his KEA with EMC, including, but not limited

to, the provision prohibiting LeBlanc from, directly or indirectly, soliciting and/or attempting to solicit, the business of any person or entity that is either a customer or potential customer of EMC, to which LeBlanc, directly or indirectly, attempted to or did, sell or provide any product or service on behalf of EMC, or about which LeBlanc obtained Confidential Information, during the two (2) year period prior to LeBlanc's last day of active employment with EMC.

(iii)   After further proceedings, enter judgment declaring that LeBlanc has violated his KEA with EMC and permanently enjoining him from further violations during the complete contractual term of his KEA with EMC; and

(iv)   Enter such other or further equitable relief as it deems just and proper.

Respectfully Submitted,

CHOATE HALL & STEWART LLP

*/s/ Paul D. Popeo*
Paul D. Popeo (BBO No. 567727)
G. Mark Edgarton (BBO No. 657593)
Anita M.C. Spieth (BBO No. 676302)
Two International Place
Boston, Massachusetts  02110
Tele: (617) 248-5000
Fax: (617) 248-4000
ppopeo@choate.com
medgarton@choate.com
aspieth@choate.com

Dated:  June 13, 2014                    *Counsel for Plaintiff EMC Corporation*

*Of Counsel*

Paul T. Dacier (BBO No. 616761)
Patricia J. Hill (BBO No. 554834)
EMC Corporation
176 South Street
Hopkinton, MA 01748
Tele: (508) 435-1000

## **<u>VERIFICATION</u>**

I, Emil Velasquez, a sales professional employed by EMC Corporation, hereby state under oath that I have read the foregoing Verified Complaint, and that the facts contained therein are true and correct to the best of my knowledge, information and belief, unless otherwise indicated in the Verified Complaint.

Signed under the penalties of perjury this 13th day of June, 2014

/s/ *Emil Velasquez*
Emil Velasquez