UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EMC CORPORATION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 14-cv-12524-IT |
| | * |
| JEREMY LEBLANC, | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

August 11, 2014

TALWANI, D.J.

I. Introduction

Plaintiff EMC Corporation ("EMC") seeks preliminary injunctive relief against its fomer employee, Defendant Jeremy LeBlanc. Pl.'s Mot. Prelim. Inj. [#5]. Because EMC has failed to show a likelihood of success on the merits of its underlying claim, the motion is DENIED.

II. Background

EMC is a technology company engaged in the business of designing, manufacturing, and selling technologies and information storage systems for managing information. One of the markets in which EMC competes is the market for computer data storage designed for large-scale high-technology environments. One of EMC's competitors in this market is Pure Storage, Inc. ("Pure Storage").

EMC first employed LeBlanc from 1999 through 2005. LeBlanc later rejoined EMC as a Senior Systems Engineer working out of EMC's office in Raleigh, North Carolina from July 30, 2012 until May 7, 2014.

EMC requires employees such as LeBlanc to enter into Key Employee Agreements at the

commencement of their employment with EMC. LeBlanc entered into such an agreement (the "Agreement"), which states that its purpose is for EMC "to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information." Verified Am. Compl., Ex. A, 1 [#16] [hereinafter Agreement]. The Agreement provides, in part:

> (b) **Non-Solicitation of Customers.** During your employment with the Company and for a period of twelve (12) months following the effective date of the termination of your employment with the Company for any reason, you will not (either on your own behalf or on behalf of any person or entity other than the Company) directly or indirectly solicit, or attempt to solicit, the business of any person or entity that is either a customer or a potential customer of the Company, to which you, directly or indirectly, attempted to or did, sell or provide any product or service on behalf of EMC, or about which you obtained any Confidential Information, during the two (2) year period prior to your last day of active employment with the Company. . . .
> (c) **Restriction on Servicing Company Customers.** For a period of twelve (12) months following the effective date of the termination of your employment with the Company for any reason, you will not provide consulting or other IT services (as an employee, contractor, or in any other capacity) of the same or similar type you provided or performed as an employee of the Company to any customer of the Company for whom you provided services or managed the delivery of services on behalf of the Company during the two (2) year period prior to your last day of active employment with the Company.

Id. ¶ 1(b), (c) [#16]. The Agreement also contains a section on customer, partner, and vendor confidentiality:

> You recognize that it is essential to the Company's success that all non-public customer, partner and vendor information is deemed to be confidential and is properly treated as a confidential trade secret. Therefore, you agree not to use or disclose any such customer, partner or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer, partner or vendor, and at the end of your employment with the Company, you will return to the Company any materials containing such information.

Id. ¶ 2. Finally, the Agreement contains a section on the confidentiality of EMC materials:

> You agree that both during your employment with the Company and thereafter you will not use for your own benefit, or for the benefit of any other person or entity, divulge or disclose to anyone, except to persons within the Company whose positions require them to know it, any information not already lawfully available to the public concerning the

> Company or any information constituting a trade secret ("Confidential Information"). Confidential Information includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business or products of the Company; any information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposals and the responses thereto.

Id. ¶ 3.

LeBlanc's last working day at EMC was May 16, 2014. Upon resigning, LeBlanc joined Pure Storage, working in the same general region in which he worked for EMC.

On June 13, 2014, EMC initiated this lawsuit, alleging that LeBlanc is actively soliciting EMC customers to which he sold or attempted to sell products or about which he gained confidential information while at EMC and seeking injunctive and declaratory relief. On the same day, EMC filed the motion for preliminary injunction, seeking to enjoin LeBlanc from "directly or indirectly soliciting or attempting to solicit the business of" Salix Pharmaceuticals, Inc. ("Salix") and State Employees Credit Union (the "Credit Union"). [Proposed] Prelim. Inj., 1–2 [#46].[1] Per this court's order on LeBlanc's motion to dismiss, this court considers EMC's motion to the extent that it proposes an injunction to preserve the status quo in advance of arbitration.

III.     Discussion

   A. *Legal Standard*

---

[1] EMC also initially sought an injunction barring LeBlanc from soliciting two additional EMC customers and ordering LeBlanc's compliance "with the other provisions of" the Agreement. [Proposed] Prelim. Inj., 2 [#46]; see Verified Am. Compl. ¶¶ 51–56 [#16]. At the July 30, 2014 Motion Hearing before this court, EMC withdrew these requests.

A court may grant a preliminary injunction if the plaintiff shows: (a) a reasonable likelihood of success on the merits of its claim; (b) that the plaintiff will suffer irreparable injury if the injunctive relief is not granted; (c) that the injury the plaintiff will suffer in the absence of an injunction outweighs the injury to the defendant that will result from the injunction; and (d) that the injunction would not harm the public interest. E.g., Corporate Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)). The first factor, the likelihood of success on the merits, "is the main bearing wall of the four-factor framework," Ross-Simons, 102 F.3d at 16 (citing Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993); Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981)), but the moving party must demonstrate all four factors to obtain relief, see IKON Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125, 128 (D. Mass. 1999) ("Failure to demonstrate all of the requirements proves fatal for a request for relief." (citing Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness, 649 F.2d 71, 74 (1st Cir. 1981))).

B. *Likelihood of Success on the Merits*

To satisfy the first factor, EMC must show the likelihood of success on the merits of its underlying claim that the Agreement is enforceable and that LeBlanc breached it, thereby causing harm to EMC. See Singarella v. City of Bos., 342 Mass. 385, 387 (1961).

The Parties agree that the Agreement is a restrictive covenant. See Pl.'s Mem. Law Supp. Its Mot. Prelim. Inj., 9 n.3 [#6] [hereinafter Pl.'s Mem.]; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., 8 [#37] [hereinafter Opp'n]. Under Massachusetts law,[2] a restrictive covenant is enforceable "if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and

---

[2] See Arbitration Policy ¶ J [#36-1] (providing that all legal disputes between EMC and EMC employees are governed by Massachusetts law).

4

consonant with the public interest." Boulanger v. Dunkin' Donuts Inc., 442 Mass. 635, 639 (2004) (citing Marine Contractors Co. v. Hurley, 365 Mass. 280, 287–88 (1974)); see Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 716 (1961). Legitimate business interests "might include trade secrets, other confidential information, or . . . the goods will [sic] the employer has acquired through dealings with his customers." Hurley, 365 Mass. at 287 (citing All Stainless, Inc. v. Colby, 364 Mass. 773 (1974)); see Oxford Global Res., Inc. v. Guerriero, No. 03-12078-DPW, 2003 WL 23112398, at *6 (D. Mass. Dec. 30, 2003) (citing Shevrin, 342 Mass. at 716). However, protection from "ordinary competition" is not a legitimate business interest. N. Am. Expositions Co. v. Corcoran, 452 Mass. 852, 870 (2009); Hurley, 365 Mass. at 287–88.

The Parties dispute whether the Agreement protects a legitimate business interest of EMC. EMC contends that the Agreement protects its goodwill and confidential and proprietary information, Pl.'s Mem, 14, while LeBlanc argues that EMC has not shown either that LeBlanc will harm EMC's goodwill or that he is using confidential or proprietary information, see Opp'n, 8.

Goodwill is "a company's positive reputation in the eyes of its customers or potential customers" and "is generated by repeat business with existing customers or by referrals to potential customers." Corcoran, 452 Mass. at 869–70 (citations omitted). To endanger an employer's goodwill, an employee, during the course of his employment, must have been "'in a position . . . to develop close relationships with a wide range of [the employer's] customers or suppliers.'" Guerriero, 2003 WL 23112398, at *7 (alterations in original) (quoting FLEXcon Co. v. McSherry, 123 F. Supp. 2d 42, 45 (D. Mass. 2000)); see All Stainless, 364 Mass. at 777 ("[T]he good will of [the plaintiff] could be harmed by a former salesman's calling on [one of plaintiff's] customer[s], *with whom he had previously dealt*, to solicit purchases on behalf of a

new employer." (emphasis added)).

With regard to Salix, EMC alleges that during the two-year period before LeBlanc's last day at EMC, LeBlanc was responsible for performing technical due diligence and analysis on Salix's technology infrastructure and the customized architecture that EMC designed for Salix. Verified Am. Compl. ¶ 40 [#16]. EMC alleges that LeBlanc is undermining the goodwill that EMC has developed with Salix by now soliciting business from Salix on behalf of Pure Storage. See id. ¶¶ 42–43. Similarly, as with Salix, EMC alleges that, in the two-year period leading up to his final day at EMC, LeBlanc assisted other EMC employees with servicing the Credit Union. Id. ¶ 47.

EMC has failed to demonstrate a likelihood of success in showing that LeBlanc had a close relationship with Salix or the Credit Union such that his employment for a competitor would result in an erosion of EMC's goodwill. For example, EMC asserts:

> [An individual from the Credit Union said] to an EMC employee . . . , 'It's kind of funny that Jeremy LeBlanc was out here last week pitching Pure, when he was working for EMC only the week before. I kind of wonder how he became a Pure expert so quickly.' Interactions such as this provoke the exact threat to EMC's customer relationships and goodwill that the [Agreement]'s one-year non-solicit provision is intended specifically to protect against.

Pl.'s Mem., 13. This quote demonstrates only that the Credit Union was aware that LeBlanc worked for EMC. There is no indication that LeBlanc had a close relationship with that individual or any other at the Credit Union.

Besides its assertions about the erosion of its goodwill, EMC has not produced direct evidence, such as affidavits attesting to a close relationship between LeBlanc and EMC customers or customer defections to Pure Storage, of a threat to its goodwill. Indeed, EMC states in its brief that it consummated a long-standing sale with Salix a week before EMC filed its motion for preliminary injunction. See Pl.'s Mem, 10 ("While he was still employed by EMC,

LeBlanc successfully encouraged [Salix] to purchase [an EMC product], a purchase which was finally consummated only last week."). And although EMC reports that an individual from the Credit Union reported to EMC that LeBlanc had joined Pure Storage, there is no indication that EMC lost goodwill with the Credit Union because of LeBlanc's move.

The court next turns to EMC's contention that LeBlanc is disclosing EMC's confidential information in contravention of the Agreement. To determine whether information is confidential, Massachusetts courts evaluate six factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972).

EMC cannot meet this standard. EMC broadly labels information "confidential" but has failed to show any likelihood of success in establishing that the information is, in fact, confidential. LeBlanc contends that each type of information that EMC labels confidential can be found either for free online or by subscribing to a service that provides such information. Cf. Sasqua Grp., Inc. v. Courtney, No. CV 10-528(ADS)(AKT), 2010 WL 3613855, at *22 (E.D.N.Y. Aug. 2, 2010) (discussing information that at one time may have been considered confidential, but now "the exponential proliferation of information made available through full-blown use of the Internet and the powerful tools it provides to access such information . . . is a very different story"). For example, EMC's "ongoing and potential customer relationships," Verified Am. Compl. ¶ 21 [#16], can be identified by asking customers who serves their data needs, by reviewing a subscription service that details which vendors supply customers' data storage products, or by checking free online sources such as LinkedIn. Cf. Hamburger v.

7

Hamburger, No. 93-3359-E, 94-1230-A, 1995 WL 579679, at *2 (Mass. Super. Sept. 29, 1995) ("[C]ustomer lists are not considered trade secrets if the information is readily available from published sources, such as business directories.").

Similarly, EMC has not demonstrated a likelihood of success in showing that LeBlanc was privy to confidential pricing information. See Aff. Jeremy LeBlanc ¶¶ 11–15 [#36-1] (stating that independent third-party intermediaries, and not LeBlanc, were responsible for pricing). Indeed, LeBlanc provides in his opposition several public Internet URLs that set forth EMC's pricing schemes for various products. See Opp'n, 13–14.

Regardless of whether LeBlanc is correct that this information is publicly available, the burden is on EMC to show that the information is confidential. As with the goodwill analysis, EMC has provided this court no direct evidence of LeBlanc's alleged violations of those portions of the Agreement dealing with confidential information.

Based on the foregoing, this court concludes that EMC has failed to show a likelihood that it will succeed on the merits. For that reason, there is no need for this court to reach the other three prongs of the preliminary injunction standard. See Ross-Simons, 102 F.3d at 16; IKON, 59 F. Supp. 2d at 128.

IV.  Conclusion

For the foregoing reasons, EMC's Motion for Preliminary Injunction [#5] is DENIED.

IT IS SO ORDERED.

Date: August 11, 2014                                    /s/ Indira Talwani
                                                                                    United States District Judge